Please accord. Good morning, Your Honors. Hania Sohail representing Kevin Maroney, the appellant in this matter. We have raised one main issue on the appeal. And the issue we are here today for is whether the Illinois Workers' Compensation Commission decision in reversing the original arbitrator's decision finding medical causation is against the manifest rate of the arbitration from which the Illinois Workers' Compensation Commission should have found that the petitioner's condition of ill-being was related to a work-related accident petitioner was involved in on December 18th of 2016. At the time of the accident, petitioner was employed by Joe Towing. He was employed as a flatbed tow truck driver. On December 18th of 2016, he was asked to go to a customer's house for a tow. He went there. There was some ice on the ground. The ice was covered by snow. He essentially ended up falling, slipping, ended up hitting his head on the concrete, and also ended up hitting his back onto the ground. He also lost consciousness for about 30 seconds. He was transported from the scene of the accident to OSF Hospital, where he was treated as a trauma patient. OSF Hospital noted a consistent history of accident, and they also noted that he had lost consciousness, at least what he was told by the customer, for approximately 30 seconds. So I could ask you a question that I'd like you to answer. Both experts, the doctor who testified for the claim in Cubie and Dr. Weiss, agree that the claimant suffered a herniated disc, did they not? They did. But the question is, their opinions differed in determining when that herniation occurred. Cubie said it was related to the accident. Weiss said it was not, correct? That's correct, Your Honor. But Cubie testified that he did not have it available to him, had not reviewed claimant's medical records from the emergency room visit on December 18th, which included the lumbar CT scan. Weiss testified he had reviewed December 2016 hospital records, including the scan. So, and obviously the commission preferred Dr. Weiss' expert opinion over Cubie's, and they had reasons for that. So how did the commission err in elevating Weiss' opinion over Cubie's? They did, Your Honor. Their decision in considering the opinion of Dr. Weiss is against the manifest rate of the evidence. If you look at the commission decision and reading from the commission decision itself, the commission says, commission views the evidence differently than the arbitrator and finds Dr. Cubie causal connection opinion was offered without knowledge and findings of the CT scan taken on the date of the accident, and is therefore not credible and is not entitled to, or is entitled to little weight. If you look at that very verbiage of the commission opinion, they want to ignore Dr. Cubie's opinion and find it not credible because Dr. Cubie did not review the CT scan taken on the date of the accident. If you look at Dr. Weiss' opinion, Dr. Weiss didn't even look at an MRI report of the lumbar spine and did not look at the MRI film of the lumbar spine. Both Dr. Cubie and Dr. Weiss admitted that in order to narrow down, pinpoint as to when a disc herniation has occurred, it is important to look at the MRI. The MRI is going to show you a lot more than what a CT will show in terms of assessing this herniation. So if you look at the totality of the evidence, Dr. Weiss' opinion is not credible. Dr. Cubie's opinion is credible. Just because Dr. Cubie didn't review the CT scan doesn't mean that he didn't know what was happening because he had looked at the MRI of the lumbar spine. So when did the herniation first appear? Didn't it appear according to the evidence? It didn't appear until May 12, 2017 MRI, correct? First MRI was conducted on that date. Yes, Your Honor. There was a CT that was performed on the date of the accident, December 18, 2016, but nothing was noted regarding a herniation on that CT. That being said, however, if you look at Ms. Wilkie's notes from May as well, she is the physician assistant that was working at Dr. Rohde's office. She also noted a disbulging going on at L5-S1 level. At least that was her interpretation of the CT scan was. So the herniation did appear first time in terms of diagnostic studies on the MRI, but that being said, there was no MRI done prior to that date. But here's the point. Here's until May 12, 2017. What's the validity of Kubi's opinion that the claimants December 2016 et al was causally related to the disc herniation when it didn't appear until a year later? Not that it didn't appear, Your Honor. It was not diagnosed as a disc herniation. I'm not claiming that the herniation appeared in May of 2017. What I'm arguing is he already had the herniation, but proper diagnostic tests were not performed until May of 2017. The only other diagnostic he has undergone prior to that time was a CT of the lumbar spine. And again, both Dr. Kubi and Dr. Weiss agreed on the fact that a CT is not the best way. It's not the gold standard of diagnosing a herniation that would be an MRI. So if you have two conflicting medical opinions, one going one way and one going the other, why does the commission have to adopt Kubi's opinion? And whose job is it to assess the medical evidence? It's the commission's job to assess the medical evidence, Your Honor. However, the opinion cannot be based on imagination. That is the manifest rate of the evidence. And what we are saying is the totality of the evidence suggests that this individual had herniation after the December 18th of 2016 accident. We already know that prior to this incident, the only thing he has is the L1 compression fracture that he was diagnosed with over 20 years ago. No problems with low back going on from that 20 years ago to 2016. Even unlike how Dr. Weiss had indicated there was a CT of lumbar spine, there was no CT of lumbar spine that this incident in December 18th, 2016, it's a pretty severe incident enough for him to lose consciousness. Then he testified, unlike what commission noted, he testified that after this incident, he did try to seek medical attention. He was unable to. He talked about talking to this individual called Becky, asking for work time insurance, calling in the adjuster, was told that adjuster has, on his case, has been reassigned, and nobody contacted him. But still, in spite of all that, he continued to work, did he not, continuously until mid-April 2017, in light of the serious injury, correct? I mean, you can't really blame the person for trying to work if he doesn't really have any means of getting treatment. I mean, he tried. He tried. He was involved in another incident around April 19th of 2017. Again, still at work, by the way. He is working. He is involved in an incident. The incident temporarily exacerbates his pain. He goes to the ER. If you look at Dr. Weiss's opinion, Dr. Weiss says, well, the herniation happened sometime around 2017. Dr. Weiss was also asked a question and was asked, based on the medical records, did anything happen between December 18, 2016, to April of 2017, when he goes to the ER? Was there any other accident, any other intervening incident? He said no. So, I guess Dr. Weiss's opinion stating that this is an acute herniation, it happened in April 2017, but he couldn't really pinpoint what caused it to happen acutely is baseless and is not very credible. If there is no incident and nothing happened between December to April, what caused the acute herniation? I mean, Dr. Weiss's opinion is not credible to begin with. I mean, during half of his deposition, he's talking about reviewing this diagnostic study of the lumbar spine, a CT of the lumbar spine taken in 2012, and then clearly on cross-examination, he admits, yeah, there wasn't no CT of the lumbar spine. The CT was of the lower abdomen. So, Dr. Weiss's opinion in indicating what has happened and what caused the herniation is not very credible. Did Dr. Weiss also testify to, was there any question that the man was suffering from disc bulges as well, which Weiss said was indicative of degenerative disease? Were there not disc changes? And he has degenerative changes comparing from the CT of the, which he indicated initially was a lumbar CT taking in 2012 to the lumbar CT 2016. That's the story he gave during the direct examination. Upon cross-examination, he admitted there was no CT of the lumbar spine in 2012, and then further admitted, it's really, you can't get a full picture comparing the CT of the lumbar spine to the CT of the abdomen in assessing if there is degenerative changes. So, if Dr. Weiss during cross or during direct examination maintained that there was degeneration going on, well, that opinion should be discounted as he was basing it on an incorrect diagnostic that he looked at. Dr. Kube, Dr. Kube did indicate there was not much disc degeneration going on, and he explained his opinion based on the fact that if you look at the adjacent level disc, you will note that the adjacent level discs were well hydrated and based on the size of the L5-2S1 herniation that was found that this was acute in nature. And I don't, again, believe that Dr. Weiss pertaining to this specific bulge said that this happened degeneratively. He indicated it happened acutely. It happened sometime in April of 2017. However, he couldn't really explain how it happened. Even though there was no intervening accident, there was nothing in between. Even, and I think counsel have argued in their brief and commission seems to have alluded in their decision. I mean, if they're really saying he had an accident and then December of 2016, in April, he had another work-related accident, which by the way commission has found wasn't to be the case, then the herniation would be related to April of 2017 accident, which is incorrect because the commission has already found that there was no accident. So if the accident and nobody appealed that decision, that is the final order of the commission indicating that there is no accident. Dr. Kuby reviewed the records. Dr. Weiss reviewed the records. Really nothing was testified by them that petitioner was involved in any intervening accident. They looked at the history. They said this was not a repetitive trauma injury that he else happened between December of 2016 to April of 2017. Petitioner claimed that right after this injury, he did have ridiculous sort of complaints. The Dr. Kuby indicated that ridiculous kind of complaints would be something that would be suggested of radiculopathy. Dr. Weiss also agreed that even though he did not, in denying causation, saying that it didn't happen in December of 2017 or 2016, Dr. Weiss said it's because of the fact that he did not have any radicular symptoms after the accident, but did admit that petitioner did advise him that he did have radicular symptoms as he was experiencing right after the accident. So Dr. Weiss. Mr. O'Hale, before we run out of time, let me ask this question. It's my understanding that Dr. Weiss will find that while he may not be able to pinpoint the intervening cause, but it was some intervening cause in mid-2017. Based upon the symptoms and the records that were reviewed, he just couldn't pinpoint what that cause was. You're not arguing that there is an intervening cause or the doctor didn't find an intervening cause, are you? Your Honor, my recollection is that Dr. Weiss' testimony stated there was no intervening cause based on the medical records that he reviewed that happened between December to April. But then he said the herniation that he found appears to have been in April. I don't recall him using the word that there was no intervening cause. There was no intervening incident. And the reason I'm arguing that is because that is the decision of the commission that nobody appealed. The arbitrator said no intervening accident. I didn't appeal it. Counsel didn't appeal it. Now I know counsel wants to come back and say, oh no, it didn't happen on or about April 19th. It happened on April 17th. Well, I mean, policy wise, if you think about that, you're really, I will carry on in my rebuttal, Your Honor. I see my time is up. Yes, you have five minutes and reply. Okay. Thank you, Counsel. Mr. O'Byrne, you may respond. Yes, Your Honor's Francis O'Byrne for Joe's Towing. And Your Honor's, I'd like to begin with counsel's arguments of facts that are not in evidence. I addressed this in my brief and I need to address that again. I know you've read my brief, but she argued again. She keeps repeating facts that are not true, which is that he tried to get medical treatment in December of 2016. He testified he did not request medical treatment until April of 2017. It is crystal clear, crystal clear. I asked him that question multiple times. He admitted to it. He testified that when he requested medical treatment, he spoke to the claims adjuster. The claims adjuster gave him the phone number of the insurance company. I asked him when that happened. He said it was when he couldn't get out of bed. He had the incident with his truck where his head hit the top. He felt like he hit with a sledgehammer. He said it was in April of 2017. That's clear. Counsel continues to argue that this happened in December. It never happened. Counsel is asking that you believe he requested medical treatment between December 18 and April of 2017. He testified he never requested medical treatment. It's clear. What did the commission say they agreed with? It's a fact in evidence. The facts that are not in evidence that counsel keeps arguing is that he requested treatment in December. It's not there. The other argument that counsel keeps making is this gold standard MRI versus CT scan. Where did that come from? He made that up. It's not in the evidence. I reread Dr. Kubey's evidence deposition testimony this morning. He never said that. That is what counsel is saying. The gold standard, he didn't review it. Dr. Kubey's testimony was that I asked him what if he was going to order an MRI. He said I didn't need to. There was already one. I said, well, you ordered an x-ray. He said there wasn't an x-ray. I said, well, there was in December. He didn't have it. I said, well, if you had that, would you have ordered an x-ray? He said, well, depending on it, but probably not. He said I wanted an MRI because that is a standard of care before I did surgery. Is he saying that the x-ray now is better than an MRI? No, he's not saying that. Did he say anything against the CT scan? No. He never even saw it. He never testified that an MRI, a CT scan should be thrown out. It never came up. It makes me crazy because it's brief. She argued it in the circuit court. She just said it again. Okay, counsel. Can you explain to us why the commission found that the foundation for Dr. Weiss's opinions were the stronger medical foundation and should be trusted? Yes, absolutely. Dr. Weiss reviewed the prior treating medical records from December. He saw the CT scan. The CT scan revealed degenerative findings, which were consistent with petitioner falling off the building 50 feet, which was a severe injury, and that even Dr. Kubi testified would have caused objective findings as referenced by petitioner with the multiple fractures he suffered. In fact, Dr. Kubi even testified that that could cause chronic pain in his back from such a severe injury. Dr. Kubi did not have that report. I asked Dr. Kubi during his deposition if the reports would have been helpful to have. He said maybe, probably, and then eventually he said it really didn't matter. As Dr. Kubi found out about the second deposition testimony, he initially said that somebody suffers an exacerbation of an injury, which goes back to its baseline after two or three weeks. Then he amended it to one or two months, and then he amended it to state, but only if they go back to full duty, full duty work with no restrictions. Then when he found out that petitioner had an incident in April, after I showed him the report dated April 19th, then he changed his position. Then he had no opinion. Then all of a sudden exacerbation was, he found that the incident with the truck was an and never stopped treating. That was an exacerbation, but what happened in December was an aggravation. It made no sense. Sorry, my screen just, oh, I apologize. My screen just disappeared. The reason why the industrial commission relied on Dr. Weiss over Dr. Kubi is Dr. Kubi's testimony was not credible based on his testimony. You could see from his deposition transcript, he was not aware of petitioner's preexisting condition because he didn't have the records. Counsel's brief references, well, Dr. Kubi was provided those records during his deposition. The only thing, the only record that he was provided, he had the MRI. Counsel showed him the report dated, I believe it was like April 24th, and vehemently objected to me showing Dr. Kubi the report dated April 19th, which I obtained from counsel by way of, from the subpoenas, the records that they subpoenaed. Counsel, if I could interject a question. Testimony of Dr. Weiss, is there other evidence in the record, aside from that, that would support the commission's decision? Other evidence than, I apologize. Other evidence other than Dr. Weiss's opinion that would support the commission's decision. Any other evidence? Oh, absolutely. His own testimony. What did petitioner testify? Dr. Kubi testified multiple times, and probably five or six times, asked petitioner, asked petitioner, asked petitioner. So I did. What did petitioner say? He said that incident driving the truck on April 14th, not April 19th, not April 18th. Counsel, I don't, I'm not sure where April 18th came from. He said he, the evidence was clear. April 14th, he was driving the truck. If he bounced around, he hit his head. He said the pain was so severe, he couldn't get out of bed. The pain was so severe. It only went away when he took heavy examination. Did it ever go back to baseline? No. He said it got worse. He said, did it get, did it ever feel the same way? And petitioner said, no, it was, it never went away. It didn't go away until he had surgery. So as far as, as respondent believes, your honor, the evidence is overwhelming from petitioner. His testimony is crystal clear that he went back to work full duty as a tow truck driver, which is a heavy job. He testified to, you know, some of the activities that he performed. And in fact, I think if I am not mistaken, he testified that he was, you know, he'd be completely covered in sweat after, after a day of work, which is not unusual. What, but he went back to work for five months doing the same job until what happened until April 14, when he had an incident where he was bounced around the truck. How do we know that? That's what he testified to who corroborated that opinion, Dr. Kube because Dr. Kube kept saying, I don't know. I don't know why he stopped working. Maybe somebody took, you know, maybe somebody took him off. In fact, Dr. Kube's testimony was that the reason maybe he didn't, he kept working for I don't know what the situation was. Maybe somebody kept him off work that wasn't in writing. Petitioner did not testify to that. Petitioner testified that he went back to work for five months. He continued to do his same job. He didn't have any light duty restrictions. And he did that up until April 14. Then everything is crystal clear. He called into the, to work, the work gave him the claims adjuster, the claims adjuster denied treatment. Why? Because he was claiming it was from an incident in December. Claims adjusters, you know, denied the case because they hadn't had treatment since December 18th. You know, the claims adjuster was not aware of another incident. In fact, he even reported, he didn't even report the incident to his employer. The employer testified, no, he didn't. He didn't report an accident. In fact, the employer's testimony was the first notice of a petitioner reporting in a second accident or an incident was when they received the application for adjustment of claim. Why did they file an application for adjustment of claim? Because during the deposition of Dr. Kube, I showed him the report from April 19th, the emergency room report, which showed that he had another incident. When counsel says that there was no intervening accident and that, you know, because there's an acute change in his condition, the acute being his herniated disc, there was no intervening accident. That's not what petitioner testified. Petitioner testified to an acute intervening accident. He was driving a truck. The springs were broken. He bounced around the truck and he hit his head. He felt like he was hit by a sledgehammer. Again, I'm repeating myself, but that's the intervening accident. That is what ended up causing him to obtain medical treatment, emergency room treatment. In fact, even Dr. Kube testified, he didn't, he doesn't know why petitioner went back to or started treating with Dr. Rohde. He said, I got a referral from Dr. Rohde. Did he have the medical records from Dr. Rohde? No, he didn't. He was shown some records during the deposition, but certainly not all of them because I questioned Dr. Kube about the records that he read. And I asked him, did Dr. Kube recommend physical therapy? He said, I don't know. You have to ask him. I then said, did Dr. Adams recommend physical therapy? Well, I don't know. Let's look. And then he looked and he said, oh, well, yeah, I guess April 24th, he recommended it. That's the treatment that was denied, that petitioner testified was denied. That's the treatment that a petitioner counsel cites in her brief happened in December. It didn't. It happened in April. That's what petitioner testified to. That's what the employer testified to, which in my position is crystal clear in the record. Therefore, in response to your question, Judge, is that the evidence from petitioner's testimony corroborates the testimony of Dr. Kube as to why he needed treatment and when that happened. That happened in April. Let's see. And I guess the only other issue I wanted to bring up that there was no intervening accident or incident between December and April. There may not have been an intervening accident, but there was certainly an accident or an incident. And that was April 14th. That's really all I have to add. I thank you for your time and I would ask that you please affirm the circuit court decision. Thank you. Thank you, counsel. Ms. Sohail, you may reply. I just want to clarify, your honor. My brief cites, I believe, page 901, which clearly indicates where Dr. Weiss had stated that in order to assess timeframe for herniation, an MRI is helpful. In terms of the two accidents, this is what they're claiming. They're claiming they agreed that he was involved in a December 18, 2016 accident. They are saying now after the case has moved forward from Illinois Workers' Compensation Commission, they're claiming now, oh yeah, he was involved in an intervening incident, may not have been an accident, at the employer on April 14th while he was doing this probe from Decatur to Lincoln. But we tried to fight him on that first and indicated it never happened as proven by the stipulation sheet where they disputed that he was involved in an accident on or about April 19, 2017. And now they're saying, no, he didn't have it. We are going to concede to it because the now all of his problems that he's experiencing is because of the April 17 accident. I mean, this does not make sense. Let me interject a question. Isn't there evidence that the claimant went to the emergency room on April 19, 2017 in severe pain? Yes, your honor. He did. So I'm not saying that the incident didn't happen, but it does not rise up to the level of being intervening incident and or accident. He did have increased in his symptomatology that he did go. And Dr. Rice and both Dr. Kube indicated that whatever this was, this was a very temporary exacerbation of his symptoms. All of the medical records point out to the fact that this problem started in December of 2016. I mean, if he was involved in an accident in April 14 of 2017, that we believe would have been an accident, we would have proceeded with both theories and said, you know, it may have been further aggravated by the April 14, 2017 accident that happened at work to the employer apparently claiming that it did happen, but it didn't happen. We didn't believe that this accident aggravated his condition to the point that he would have required further treatment other than the initial emergency room. Did he testify he could hardly move or walk after that? And he was given a narcotic for the pain, didn't he? He did testify that. Hardly move or walk is not being serious. I understand that your honor, but the medical opinion that we have, the medical causation does indicate that this was not an intervening incident. This has merely just exacerbated his symptoms. We would request that you affirm the Illinois workers' compensation decision of the original arbitrator and reverse the decision of the commission. We do believe that the arbitrator initially was correct in finding that there was medical causation and the arbitrator essentially reviewed all of the medical records, which again, consistently document that this all emerged from the initial treatment that petitioner or the initial accident petitioner was involved in on December 18th of 2016. Okay. Thank you counsel both for your arguments in this matter. It will be taken under advisement and a written.